UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


ALLAN PAUL ROBICHAU,
     Plaintiff,


     v.                             CIVIL ACTION NO. 14-14119-MPK[1]


CAROLYN W. COLVIN,
     Acting Commissioner of
     Social Security Administration,
     Defendant.


MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION FOR JUDGMENT ON
THE PLEADINGS (#12) AND DEFENDANT'S
MOTION FOR AN ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER (#22).


KELLEY, U.S.M.J.


I. INTRODUCTION

Plaintiff Allan Paul Robichau seeks reversal of the decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, denying him Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. Defendant moves for an Order affirming her decision. With

---

[1]
     With the parties' consent, this case was reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (#19.)

the administrative record (#7) having been filed and the issues fully briefed (##13, 23), the cross motions stand ready for decision.

## II. BACKGROUND

### A. Procedural History

Robichau filed for SSDI and SSI on June 9, 2011. (TR[2] at 111, 294.) His disability onset date was June 20, 2009. (TR at 293, 297.) The two claims were originally denied on September 28, 2011 and then again on reconsideration on January 30, 2012. (TR at 111-114.) Plaintiff requested a hearing before an administrative law judge, which was held on June 18, 2013. (TR at 48-83.) Robichau appeared at the administrative hearing with his legal representative. (TR at 48.) Both Plaintiff and a vocational expert testified at the hearing before the ALJ. (TR at 48-83.)

The ALJ issued a decision unfavorable to Robichau on July 12, 2013. (TR at 27-41.) Plaintiff filed a request for review of hearing decision on July 26, 2013. (TR at 6-7.) On September 11, 2014, the Appeals Council denied the request for review. (TR at 1-5.) As a consequence of the denial, the ALJ's decision *de facto* became the final decision of the Acting Commissioner, subject to judicial review under 42 U.S.C. § 405(g). The instant action was filed on November 9, 2014. (#1.)

### B. Factual History

---

[2]

The designation "TR" refers to the administrative record. (#7.)

According to his testimony at the administrative hearing, at that time Plaintiff was 48 years old and went as far as the seventh grade in school. (TR at 52-53.) Robichau is married and has a son. (TR at 72.) He lives with his wife, son, and parents. *Id.* Robichau worked as a roofer from 1988 to 2005; for Home Depot as a freight mover from 2005 to 2009; and again as a roofer for one to two weeks in 2011.[3] (TR at 53-57.)   He  has not worked since his brief stint as a roofer in 2011. (TR at 56.)

## 1. Medical History

Robichau's relevant medical history begins in October 2007 when he received the first of five injections in his spine to combat back pain. (TR at 396.) The injections continued into July of 2008. (TR at 392-397, 412-413.) On October 17, 2008, Robichau received an MRI of his lumbar spine which revealed, *inter alia*, "[m]ild stable chronic anterior wedging of the L2 vertebral body suggest[ing] a remote old healed L2 vertebral body compression fracture, . . . [m]ild stable degenerative changes, . . . [and] [s]light scoliosis." (TR at 465-466.)

On January 19, 2009, Plaintiff, complaining of back pain radiating into the right

---

[3]    Plaintiff testified that he was immediately let go from his 2011 roofing job because his employer felt that he was no longer able to perform the tasks necessary to complete the work. (TR at 57.) This period of employment was not included in his Work History Report. (*See* TR at 305.)

hip, was treated at the Emergency Department of the Lahey Clinic ("Lahey ED"). (TR at 407-410.)  The cause of the injury was determined to be shoveling snow. (TR at 407.)  Robichau was diagnosed with an acute lumbar strain, prescribed Vicodin, limited in his lifting for a week, and told to follow up with a physical therapist. (TR at 407-410.)

On June 13, 2009, Plaintiff was seen in the Emergency Department of the Northeast Hospital Corporation (the "Northeast ED") for complaints of chest, left arm, and left back pain that had been ongoing for the previous week. (TR at 416.) The level of pain was stated to be a 5 out of 10. *Id.* Robichau was prescribed Tylenol with Codeine and referred to his primary care physician for a follow-up appointment.  (TR at 417.)

On July 14, 2009, Plaintiff was in a low-speed motor vehicle accident and was taken to the Northeast ED for neck pain. The level of pain was said to be 8 out of 10. (TR at 418.)  The treating physician noted that Robichau stated that after the accident "he took a couple of Vicodin, drank some alcohol, and then decided to come to the emergency department to have [his neck] evaluated." *Id.* Robichau was prescribed Vicodin, told to consult with his primary care physician, and discharged. (TR at 419.) Two days later, on July 16, 2009, Robichau was seen at Family Medical Associates ("FMA"), his primary care provider, per the emergency department doctor's

recommendation. (TR at 809-810.) Plaintiff was told to take the muscle relaxants he had been prescribed and to return if necessary. (TR at 810.)

On August 3, 2009, Robichau was seen at the FMA by Nurse Practitioner Nancy Lyons. (TR at 581-583.) The purpose for his visit was assistance with stress and difficulty sleeping as a result of an altercation he had at work in which Plaintiff threatened to kill his general manager. (TR at 581.) Plaintiff believed he was depressed and Ms. Lyons recorded his affect as anxious. (TR at 582.) Robichau requested a refill of his Vicodin prescription. *Id.* He was diagnosed with general anxiety and back pain. *Id.*

On September 28, 2009, Plaintiff was seen at the FMA by his primary care physician, Phillip Burrer, M.D., for his ongoing anxiety. (TR at 577.) Robichau complained of anxiety, depression, fatigue, stress, panic attacks, and insomnia. *Id.* Dr. Burrer diagnosed Robichau with general anxiety, back pain, chronic pain syndrome, fatigue, insomnia, and low back pain. (TR at 578.) Dr. Burrer noted that Plaintiff appeared to be anxious and agitated. *Id.*

On November 30, 2009, Robichau presented at the Lahey ED with complaints of rib pain on his right side incident to slipping off the hood of his truck and falling onto the blade of a snow plow. (TR at 401.) X-rays were ordered, but Robichau walked out before they could be administered. (TR at 404.) On December 2, 2009,

Plaintiff presented at the Northeast ED for the same injury and x-rays were taken. (TR at 421.) The x-rays showed "clear lungs and no evidence of acute rib fracture." *Id.* Robichau was prescribed Percocet for the pain. *Id.* Plaintiff returned to the Northeast ED on December 8, 2009 complaining of ongoing rib pain; he was prescribed Percocet and Motrin to help with the pain. (TR at 423-424.) Plaintiff was seen by Dr. Burrer as a follow-up to the fall from the hood of his truck on December 21, 2009. (TR at 573-574.) He was diagnosed with rib pain, back pain, and chronic pain syndrome. (TR at 574.)

In the winter of 2010 Plaintiff suffered from a variety of cold related ailments. Over the course of January and February of that year, Robichau was seen at the FMA several times for symptoms including sore throat, cough, and bronchitis. (TR at 567, 568, 571, 572.) On March 4, 2010, Plaintiff was seen at the Northeast ED for chest pain, shortness of breath, fever, and cough. (TR at 425.) The treating physician noted that Robichau continued to smoke and abuse alcohol, "8 glasses of wine per day at least." *Id.* Plaintiff left the emergency department against medical advice. (TR at 426.)

On May 25, 2010, Robichau was seen at the FMA by Nurse Practitioner Katelynne Lyons ("NP Lyons")[4] for a follow-up to discuss his medications. (TR at

---

[4] As there are two nurse practitioners with the surname Lyons, Katelynne Lyons will be referred to as "NP Lyons."

564.) Plaintiff stated that the Prozac was not helping anymore and that he wanted to stop taking the pain medication for his back. *Id.* A physical examination revealed decreased range of motion in Robichau's neck and back. (TR at 565.) Plaintiff returned to NP Lyons on July 6, 2010, complaining of stress as a result of purchasing a new house and not being employed. (TR at 562.) Robichau believed that his medications were insufficient and stated that he would like to see a psychiatrist. *Id.* NP Lyons diagnosed Plaintiff with fatigue, stress reaction, insomnia, and grief reaction. (TR at 563.)

Seven weeks later, on August 20, 2010, Robichau returned to NP Lyons for a follow-up to his July 6 appointment. (TR at 559.) Plaintiff reported improvements with the use of medication, and that he started seeing a psychiatrist. *Id.* Robichau stated that he was unable to work because of the pain in his back, that his mental stressors had improved, and that he recently applied for disability. *Id.* An examination of Robichau revealed lumbar tenderness and spasm, but no neurological abnormalities. (TR at 560.)

At an office visit on September 17, 2010, Robichau complained to Dr. Burrer of pain in his right hip and side of his back as a result of an injury suffered while working at a "roof job" three weeks prior.[5] (TR at 556.) Dr. Burrer prescribed physical

---

[5] This period of work was not recorded in Plaintiff's Work Activity Report, nor was it

therapy. (TR at 558.)  Two months later, on November 10, 2010, Robichau was seen by NP Lyons for chronic low back pain and anxiety. (TR at 534.) The resulting diagnosis confirmed as much. (TR at 535.)

On February 16, 2011, Plaintiff was evaluated by Michael Yoon, M.D., of the FMA. (TR at 536.)  Robichau presented to Dr. Yoon with tingling and numbness in the left side of his face, pus in his left eye, headache, fatigue, and weakness in the left arm and leg. *Id.* Dr. Yoon suspected that Robichau had suffered a stroke and advised him to go the emergency department. (TR at 538.) On the same date, Plaintiff was admitted to the Northeast ED for a suspected stroke. (TR at 432.) After diagnosing him with a stroke and parasthesias of several extremities, the treating physicians eventually discharged Robichau and recommended that he consult with an ophthalmologist and follow up with Dr. Burrer. (TR at 433.) A history of alcohol abuse was documented and cocaine was discovered in Plaintiff's urine. *Id.* When questioned about the positive drug test, Robichau stated that he was unsure how that could be, as he did not use cocaine. *Id.*

Plaintiff followed up with Dr. Burrer on March 22, 2011 for ongoing symptoms incident to the stroke including tingling in the left side of his head and face, pus in his eye, and weakness in his left arm and leg. (TR at 599.) Dr. Burrer noted that Robichau

---

referenced at the hearing. (*See* TR at 48-83, 305.)

had presented to Dr. Yoon the prior month with similar symptoms; he also noted the positive drug screen. *Id.* An Echocardiogram and MRI/A of the brain were conducted. *Id.* In his psychiatric evaluation of Robichau, Dr. Burrer noted that Plaintiff might be faking the symptoms. (TR at 600.) Robichau was seen at the Northeast ED for similar symptoms on April 9, 2011. (TR at 434.) The treating physician documented the inconsistency between Plaintiff's denial of the use of alcohol or illicit drugs and his positive test for cocaine and opiates. *Id.* Robichau was diagnosed with left facial weakness and left-sided parasthesias. (TR at 435.) Plaintiff ultimately stated that he wanted to leave; the treating physician, noting that Robichau was stable, acquiesced and recommended that Plaintiff make an appointment to see a neurologist. *Id.*

The report of a May 23, 2011 office visit with Dr. Burrer reflects treatment for symptoms consistent with sinusitis. (TR at 539.) Ten days later, on June 2, 2011, Plaintiff returned to Dr. Burrer. (TR at 541.) Robichau complained of pain in his groin as a result of physical exertion and blunt trauma. *Id.* Later in the month, on June 16, 2011, Plaintiff was seen by Nurse Practitioner Janice Thoen of the FMA for pain in his lower back. (TR at 543-544.) Robichau stated that the pain was chronic, but had been exacerbated incident to his mowing the lawn. (TR at 543.) An x-ray taken on June 28, 2011 revealed, *inter alia*, "[a] slight compression abnormality, . . . slight anterior wedging, . . . and minimal vascular abnormality." (TR at 474, 630.) That same

day, Robichau was also seen by Dr. Burrer for a skin rash on his scalp. (TR at 545.)

Robichau returned to Dr. Burrer for a follow-up appointment for low back pain on July 7, 2011. (TR at 547.) Robichau was assessed to have back pain and appeared anxious and agitated. (TR at 548.) An MRI of Plaintiff's back was taken on July 16, 2011. (TR at 476.) The MRI showed, *inter alia*, "[m]ild chronic and stable anterior wedging of L2, [m]ild disc degeneration at L2-3 with slight disc bulging, and no disc herniation or spinal stenosis." (TR at 476-477.) When compared to a July 2008 MRI, the results showed no significant change. (TR at 477.)

NP Lyons treated Robichau for chronic back pain on August 1, 2011. (TR at 614.)  In similar fashion to his July 6 visit, Robichau complained of chronic back pain that was exacerbated by mowing his lawn. *Id.* He stated that the pain radiated from his back to his buttocks and thigh. (TR at 614-615.) The record of treatment noted Robichau to have an agitated and anxious demeanor throughout the course of his August 1 visit. *Id.*

Plaintiff returned to NP Lyons on August 31, 2011 to discuss disability and get his medications refilled. (TR at 616.) Over the course of the visit Robichau reported chronic pain with moderate intensity. *Id.* An echocardiogram and MRI were performed and  found to be negative.  *Id.* A physical examination revealed decreased range of motion with back flexion and extension.  (TR at 617.)  NP Lyons reported

10

that Robichau saw a neurologist, Harneet Singh, M.D.  However,  Plaintiff stated that he was unable to secure an appointment at the MGH stroke center, as was recommended by Dr. Singh.  (TR at 616.)

Throughout October 2011, Plaintiff was treated at the FMA for urinary problems.  (TR at 618-623.) On November 30, 2011, Robichau was seen by Dr. Yoon. (TR at 624.) Plaintiff reported  facial episodes over the previous few weeks consisting of numbness, tingling, headache, and loss of motor function.  *Id.*  Robichau was referred back to Dr. Singh. (TR at 626.)

On December 3, 2011, Robichau was treated at the Lahey ED for pain localized to his right flank. (TR at 689.) He was diagnosed with kidney stones and was ultimately discharged after the pain level was decreased. (TR at 689-697.)

On January 10, 2012, NP Lyons saw Plaintiff as a follow-up for his seizure and for treatment related to his history of sinusitis. (TR at 760.) An electroencephalogram taken on January 26, 2012 was within the normal limits. (TR at 712.) The following day, Robichau was seen by Ms. Thoen for complaints of low back pain. (TR at 713.) Plaintiff was again assessed to have chronic low back pain. (TR at 714.)

At a February 3, 2012 visit to the FMA, Robichau was seen by NP Lyons for low back pain and the completion of his disability forms. (TR at 715.) Plaintiff presented with a limp, limited range of motion, and an anxious and agitated demeanor.

11

(TR at 716.) Robichau returned for a follow-up with NP Lyons on February 17, 2012. (TR at 717.) The record of treatment noted ongoing complaints of facial droop, denial of any recent head trauma, and that Plaintiff started seeing a neurologist. *Id.* NP Lyons found the neurologist's tests to be negative. *Id.*

On March 30, 2012, Plaintiff was seen by NP Lyons for a follow-up appointment for his kidney stones and generalized anxiety. (TR at 728.) Robichau stated that the Prozac was not treating his anxiety as effectively as it had previously, and he wanted to increase his medication or try something different. *Id.* NP Lyons determined his psychiatric state to be within the normal ranges and prescribed Wellbutrin for his depression and anxiety. (TR at 729.)

On May 29, 2012, Plaintiff was sent to the Northeast ED from jail for pain and swelling in his left elbow from what appeared to be a bug bite. (TR at 730-735.) Robichau was treated and returned to jail. *Id.* On September 17, 2012, Robichau was seen at the FMA by Nurse Practitioner Jarra Carney.[6] (TR at 779-781.) Plaintiff stated that he spent the previous five months at Middleton Jail and had been without his medication for the entirety of his stay. *Id.* Robichau was seeking refills for all of his

---

[6]     Ms. Carney is supervised by Dr. Yoon. (TR at 779-781.) Dr. Yoon co-signed the September 17 report. *See id.*

medications. *Id.* Ms. Carney called the Middleton Jail[6] infirmary and was informed that Plaintiff had been weaned off all narcotics over the course of his incarceration. (TR at 780.) The infirmary told Ms. Carney that Robichau had done well taking Motrin and did not exhibit any signs of uncontrolled pain. *Id.* A physical examination revealed "normal gait; normal range of motion of all major muscle groups; pain with range of motion: back in flexion." *Id.*

On September 21, 2012, Plaintiff began treatment with Susan Rudman, Ed. D., a licensed psychologist. (TR at 861.) According to a letter authored by Dr. Rudman, she saw Robichau regularly through June 10, 2013. *Id.* Dr. Rudman refused to provide her records of treatment for Plaintiff. *See id.*

Plaintiff's first recorded medical visit in 2013 occurred on February 6th. (TR at 836.) Robichau presented for a consultation, per his primary care physician's request, with Sara Lee, M.D., of the North Shore Physicians Group. *Id.* Dr. Lee conducted a physical examination and observed Plaintiff to walk with an antalgic gait, so an MRI was ordered. (TR at 837.) The MRI, administered April 10, 2013, revealed, *inter alia*, "[m]ild to moderate central canal stenosis, . . . mild facet arthopathy, . . .

---

[6]

There appears to be a discrepancy regarding the name of the institution in which Robichau was housed for the period of his incarceration. Ms. Carney initially refers to the institution as "Middleton Jail" on page 1 of her treatment report, but subsequently refers to it as "Middlesex County Correction Facility" on page 2. (*See* TR at 779-780.)

[m]ild diffuse degenerative disc disease, multilevel small disc bulges, . . . mild multilevel foraminal narrowing, . . . and [m]ild exaggerated kyphotic angulation . . . ." (TR at 838-839.)

On April 30, 2013, Robichau was seen for chronic back pain by Navid Mahooti, M.D. (TR at 845.) Dr. Mahooti observed that Plaintiff presented with a cane to ambulate and moved around frequently during the visit. (TR at 846.) Having seen Robichau on two previous occasions, Dr. Mahooti compared his demeanor to his previous visits and noted that Plaintiff appeared less comfortable on April 30.[7] *Id.*

Plaintiff was seen by Dr. Lee for a follow-up to review his April 10, 2013 MRI results on June 11, 2013. (TR at 835, 838-839.) Dr. Lee opined that there was "no significant central stenosis at any level, . . . there [were] multilevel degenerative changes that were contributing to his back pain, . . . and there was disc ostephyte to the left of L4-5 . . . ." *Id.* Robichau was referred for a surgical consultation. *Id.*

## 2. Medical Opinions

On August 22, 2011, Jane Mathews, M.D., an advising physician to the Disability Determination Services, found Plaintiff capable of performing light work with certain limitations. (TR at 91-92.) Dr. Mathews concluded that Robichau was not

---

[7]

Dr. Mahooti's two preceding appointments with Robichau are not contained within the administrative record.

disabled.  *Id.* Two weeks later, on September 6, 2011, Stanley Rusnak, ED. D, also opining for the Disability Determination Services, examined Plaintiff. (TR at 549-553.) Dr. Rusnak concluded that Robichau had a mood disorder, personality disorder, back pain, arthritis, left arm weakness, and a Global Assessment Functioning ("GAF")[8] score of 50.  *Id.*

On September 26, 2011, Eugene Fierman, M.D., an advising psychiatrist to the Disability Determination Services, determined that Robichau was able to perform light unskilled work. (TR at 96.) On January 20, 2012, Sandra Diaz, Ph.D, an advising psychologist to the Disability Determination Services examining Robichau's disability status on reconsideration, concurred with Dr. Fierman's conclusion that Plaintiff is not disabled. (TR at 124-126.)

Henry Astarjian, M.D., an advising physician to the Disability Determination Services, reconsidered Plaintiff's physical status on January 24, 2012. (TR at 124.) Dr. Astarjian's opinion as to Plaintiff's physical status was in line with Dr. Mathews' initial conclusion, with the only differences being Dr. Astarjian determined that Robichau could only stand for four hours in an eight-hour day, could climb

---

[8]

"The GAF scale ranges from zero to 100 and [c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Social Security Claims and Procedures § 8:137 (6th ed.) (alterations in original) (internal citation and quotation omitted). "A GAF of 41–50 indicates that the individual has [s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning . . . ." *Id.*

ramps/stairs occasionally, could never climb ropes and ladders, and should avoid concentrated exposure to extreme temperatures, whereas Dr. Mathews found he could stand for six hours, climb ramps/stairs frequently, climb ropes and ladders occasionally, and was not limited in his exposure to temperatures. (*Compare* TR at 91 *with* TR at 122.) Both physicians ultimately concluded that Robichau was not disabled. (TR at 96, 128.)

On August 17, 2012, Dr. Yoon completed a Multiple Impairment Questionnaire ("MIQ") on Plaintiff's behalf. (TR at 740-748.) Dr. Yoon diagnosed Robichau with chronic back pain rated at 5 out of 10, depression, anxiety, and kidney stones. (TR at 741.) It was Dr. Yoon's opinion that Robichau could sit for one hour in an eight-hour workday and stand for four in the same period, frequently lift up to ten pounds, occasionally carry ten to twenty pounds, would need to take unscheduled breaks every hour, and would be absent more than three times per month. *Id.*

On April 30, 2013, Dr. Mahooti completed a MIQ for Robichau. (TR at 852-860.) Dr. Mahooti reported that Plaintiff walked with an antalgic gait, had pain upon palpation, was restricted in his range of motion, and walked with a cane. (TR at 852.) With respect to Plaintiff's ability to perform over the course of an eight-hour work day, Dr. Mahooti reported that Robichau could sit for five hours and stand/walk for three hours per day. (TR at 855.) Plaintiff was given a prognosis of "fair." (TR at

852.)

Opining as to Robichau's mental condition, Dr. Rudman completed a Psychiatric Impairment Questionnaire on May 13, 2013. (TR at 821-828.) She stated that Plaintiff's current GAF was 44 and the lowest it had been in the past year was 40. (TR at 821.) Dr. Rudman's prognosis for Robichau was "limited to poor" and she found him to "markedly limited" in his ability to perform in a workplace setting. (TR at 821, 823.)

### 3. Hearing Testimony

At the hearing, Plaintiff stated that he suffered from chronic low back pain, numbness on the left side of his body as a result of a stroke, anxiety, and depression. (TR at 57-58.) Robichau described the chronic back pain as sharp and aggravating. (TR at 61.) Addressing his daily limitations due to his conditions, Robichau testified that he usually only slept between four and five hours per night because of the pain in his left leg; if medicated, he could sit for between two and two and one half hours before needing to walk around; and could not lift more than ten pounds with either hand. (TR at 62-64, 66-67.) Plaintiff stated that to cope with his physical ailments he walked with the assistance of a cane, took hot showers, and would sit or lay prone for extended periods. (TR at 64-65.) With respect to his psychological maladies, Robichau explained that his state of depression resulted in a lack of motivation, no

desire to interact with others, and a preference to remain bedridden for two to three

day periods. (TR at 70.)

### III. <u>THE STANDARD OF REVIEW</u>

Title 42 U.S.C. § 405(g) provides, in relevant part:

> Any individual, after any final decision of the
> Commissioner of Social Security made after a hearing to
> which he was a party, irrespective of the amount in
> controversy, may obtain a review of such decision by a
> civil action commenced within sixty days after the mailing
> to him of notice of such decision or within such further
> time as the Commissioner of Social Security may allow . .
> . . The court shall have power to enter, upon the pleadings
> and transcript of the record, a judgment affirming,
> modifying, or reversing the decision of the Commissioner
> of Social Security, with or without remanding the cause for
> a rehearing. The findings of the Commissioner of Social
> Security as to any fact, if supported by substantial evidence,
> shall be conclusive . . . .

The court's role in reviewing a decision of the Commissioner under this statute is

circumscribed:

> We must uphold a denial of social security disability
> benefits unless 'the Secretary has committed a legal or
> factual error in evaluating a particular claim.' *Sullivan v.*
> *Hudson*, 490 U.S. 877, 885, 109 S. Ct. 2248, 2254, 104 L.
> Ed. 2d 941 (1989). The Secretary's findings of fact are
> conclusive if supported by substantial evidence. *See* 42
> U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S.
> 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).

*Manso-Pizarro v. Secretary of Health & Human Servs.,* 76 F.3d 15, 16 (1st Cir. 1996);

*see Reyes Robles v. Finch*, 409 F.2d 84, 86 (1st Cir. 1969) ("And as to the scope of court review, 'substantial evidence' is a stringent limitation").

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Irlanda Ortiz v. Secretary of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). It has been explained that:

> In reviewing the record for substantial evidence, we are to keep in mind that 'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Secretary of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981) (quoting *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)).  In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. *See Ward v. Commissioner of Social Sec.*, 211 F.3d 652, 655

(1st Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

Finally,

> Even in the presence of substantial evidence, however, the
> Court may review conclusions of law, *Slessinger v. Sec'y
> of Health & Human Servs.*, 835 F.2d 937, 939 (1st Cir.
> 1987) (per curiam) (citing *Thompson v. Harris*, 504 F.
> Supp. 653, 654 [(D. Mass.1980)]), and invalidate findings
> of fact that are 'derived by ignoring evidence, misapplying
> the law, or judging matters entrusted to experts,' *Nguyen v.
> Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

*Musto v. Halter*, 135 F. Supp.2d 220, 225 (D. Mass. 2001).

## IV. DISCUSSION

In order to qualify for SSDI or SSI benefits, a claimant must prove that he/she

is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than

12 months." Title 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In making the decision

to deny Plaintiff's request for disability benefits, the ALJ conducted the familiar five

step evaluation process to determine whether an adult is disabled.  *See* 20 C.F.R. §§

404.1520(a), 416.920(a); *Goodermote v. Secretary of Health & Human Servs.*, 690

F.2d 5, 6-7 (1st Cir. 1982); *Veiga v. Colvin*, 5 F. Supp.3d 169, 175 (D. Mass. 2014).

The ALJ concluded that: 1) Robichau had not engaged in substantial gainful activity

since June 20, 2009, the alleged onset date;[9] 2) Robichau had severe impairments, to wit, low back pain secondary to a slight L2 compression abnormality and degenerative disc disease status post facet blocks, nerve root blocks, depression, and anxiety; 3) Robichau does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; 4) Robichau retained the following residual functional capacity:[10] he can lift twenty pounds occasionally and ten pounds frequently; he can stand and/or walk for four hours total over the course of an eight-hour workday; he can sit for six hours total over an eight-hour workday; he can occasionally climb ramps and stairs with a need to avoid climbing ropes, ladders, and scaffolds; he can occasionally balance, stoop, kneel, crouch, and crawl; he needs to avoid concentrated exposure to extreme cold, heat, humidity, vibrations, and hazards; he can understand and remember simple instructions; he can concentrate on simple tasks in two-hour increments over an eight-hour workday; he can interact appropriately with coworkers and supervisors; and he can adapt to changes in work settings; 5) Robichau is unable

---

[9]

Robichau only made $896.00 for his brief work as a roofer in 2011. (TR at 56.) Therefore, this work did not rise to the level of substantial gainful activity. *See* 20 C.F.R. § 404.1574 (2006).

[10]

A Social Security claimant's residual functional capacity ("RFC") is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular continuing basis," despite his/her mental and physical limitations. SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); *see* 20 C.F.R. §§ 416.920(e), 416.945, 404.1545(a)(1).

to perform any past relevant work, but is able to perform jobs that exist in significant numbers in the national economy; and 6) Robichau has not been under disability from June 20, 2009 through July 12, 2012, the date of the ALJ's decision. (TR at 29-40.)

## A. Weight of Medical Opinions

Robichau takes issue with the ALJ's decision in several respects.  First, he contends that the ALJ failed to weigh properly the medical evidence.  (#13 at 13.) It is Robichau's position that Drs. Yoon and Mahooti's opinions should have been given controlling weight, or, in the alternative, that the ALJ failed to evaluate properly their opinions with respect to the factors set forth in 20 C.F.R. §§ 404.1527 and 416.927. (#13 at 13-19.)

> The opinion testimony of the treating physician must be given controlling weight if it is well-supported and not inconsistent with the other substantial evidence on the record. 20 C.F.R. § 404.1527(d)(2); *see also Clayton v. Astrue*, No. 09–10261–DPW, 2010 WL 723780, at *6 (D. Mass. Feb.16, 2010) (applying the consistency standards of 20 C.F.R. § 404.1527(d)(2)). This means that while there is a general presumption of deference to the treating physician's opinion, the ALJ can choose not to grant the opinion controlling weight if that opinion is inconsistent with other substantial evidence in the record. *Green v. Astrue*, 588 F. Supp.2d 147, 154 (D. Mass. 2008). Decisions regarding inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ, and not the Court, to resolve. *Costa v. Astrue*, 565 F. Supp.2d 265, 271 (D. Mass. 2008) (citing *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981)).

*Abubakar v. Astrue*, No. 11-cv-10456, 2012 WL 957623, at *8 (D. Mass. Mar. 21,

2012).  Robichau argues that the ALJ erred by rejecting the opinions of Drs. Yoon and

Mahooti, Plaintiff's treating physicians, with respect to their findings as to Robichau's

physical limitations. (#13 at 15.)

The record is clear that the ALJ did not reject either opinion, but that he gave

them less weight based on their inconsistencies with the record as a whole.  *See* 20

C.F.R. § 404.1527(c)(2) ("If we find that a treating source's opinion on the issue(s)

of the nature and severity of your impairment(s) is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in your case record, we will give it controlling weight");

*Frenche v. Colvin*, No. 14-cv-263, 2015 WL 4407940, at *3 (D. R.I. July 20, 2015)

("The ALJ may discount a treating physician's opinion or report regarding an inability

to work if it is unsupported by objective medical evidence or is wholly conclusory")

(citing *Keating v. Sec'y of Health and Human Servs.*, 848 F.2d 271, 275–276 (1st

Cir.1988)). Such a decision is for the ALJ and the Court will confine its examination

to the evidence and reasoning relied upon to reach such a conclusion. *See McNelley

v. Colvin,* No. 14-cv-14342, 2015 WL 3454721, at *4 (D. Mass. May 29, 2015) ("If

the treating physician's opinion is inconsistent with other evidence in the record, the

conflict is for the ALJ, not the court, to resolve. The ALJ's decision must nevertheless

"contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record.") (citing and quoting *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981) (internal quotation omitted) and SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996)). Thus, reversal or remand is only warranted if the ALJ's decision was factually unfounded or devoid of sufficient justification. In the instant case, the ALJ's decision was adequately supported.

### 1. Treating Physicians

The ALJ chose to give Dr. Yoon's opinion little weight for three articulated reasons. First, the ALJ found "Dr. Yoon's disabling limitations [to be] inconsistent with the diagnostic evidence of record." (TR at 37.) Second, Robichau "does not present clinically with any focal neurological deficits." (TR at 38.) Third, "the limitations in Dr. Yoon's opinion are more restrictive than the claimant's own testimony regarding his limitations." *Id.*

The ALJ included in his decision a detailed review of Robichau's medical history beginning in October 2007 and continuing through the date of hearing, June 18, 2013. (*See* TR at 32-37.) As part of his recitation of the medical record, the ALJ examined Robichau's MRI reports and noted their findings of "mild" and "stable" changes. (*See* TR at 33-34, 36.) Further analysis of the MRI reports can be seen in

the ALJ's analysis of Plaintiff's credibility. (*See* TR at 38.)

Plaintiff's argument that "the MRIs in the record confirmed spinal abnormalities" is not a conclusion contrary to that of the ALJ. The ALJ accounted for these abnormalities in Robichau's RFC. (*See* TR at 39-40) (finding Robichau unable to perform any of his past work and limiting his RFC to light unskilled work). It is Plaintiff's position that the evidence contained in the record warrants a finding of greater limitation than what was determined by the ALJ. A review of the ALJ's decision shows that the ALJ considered all of the medical evidence before determining Robichau's RFC.

Robichau does not contest the ALJ's second justification for discounting Dr. Yoon's opinion; Robichau does not argue that he has focal neurological deficits. (*See* #13.) With respect to the third justification for the limited weight given to Dr. Yoon's opinion, the ALJ noted the inconsistency between Dr. Yoon's opinion and Robichau's testimony, finding "[f]or example, Dr. Yoon opined that the claimant is only able to sit for one hour in total in an eight-hour workday; whereas, the claimant testified that he is able to sit for two to two and one half hours at a time." (TR at 38.) Plaintiff takes issue with the ALJ's reliance on such an example, arguing that Dr. Yoon's opinion was in response to Robichau's ability to perform in a workplace, while Plaintiff's testimony was in response to a general unqualified question. (#13 at 15-16.) The ALJ

was present at the hearing and was apprised of the context within which Robichau's answers were given. *See Frustaglia v. Sec'y of Health and Human Servs.*, 829 F.2d 192, 195 (1st Cir.1987) (citing *DaRosa v. Sec'y of Health and Human Servs.*, 803 F.2d 24, 26 (1st Cir.1986)) (finding that it is for the ALJ to determine how testimony fits in with the rest of the evidence and deference must be given to those considerations). Further, the ALJ found Dr. Yoon's opinion to be inconsistent with Dr. Fierman's opinion that Robichau could sit for six hours in an eight-hour day, which the ALJ found to be consistent with the record as a whole. (TR at 38; *compare* TR at 741-748 *with* TR at 90-96.)

Based on the medical record before the Court, Dr. Yoon saw Plaintiff on four occasions, all of which occurred between February of 2011 and September of 2012: February 16, 2011, October 19, 2011, November 30, 2011, and September 17, 2012.[11] (TR at 536-539, 620-629, 679-684, 779-781.)  None of the appointments where Dr. Yoon is listed as the provider were in response to Robichau's chronic pain. *See id.* The three appointments were for a sinus infection, urinary track infection, and a follow up to a potential stroke.  *Id.* Such limited interaction with Plaintiff, the majority of which

---

[11]
      On September 17, 2012, Robichau was seen at the FMA. (TR at 779.) The provider is listed as Ms. Carney, with her supervisor being Dr. Yoon. *Id.* Both Ms. Carney and Dr. Yoon electronically signed the report. (TR at 781.) Ms. Carney electronically signed on September 17, while Dr. Yoon's signature was recorded on the following day. *Id.*  The ALJ cites this visit as an appointment with Dr. Yoon, while Plaintiff reports this to be a visit with Ms. Carney. (*See* TR at 36; #13 at 7.) For the sake of consistency, the visit will be credited to Dr. Yoon.

is not germane to the issues here, cuts against Dr. Yoon's standing as a treating

physician with a better understanding of Plaintiff's ongoing issues than a non-

examining doctor.[12]

Dr. Mahooti's contact with Plaintiff was limited to three visits.  Dr. Mahooti

described Robichau as "new to [him]." (TR at 859.) In Dr. Mahooti's MIQ, several

of the questions are answered with "I don't know" or "possibly  yes." (TR at 852-

860.) Dr. Mahooti conceded that to answer questions pertaining to Robichau's ability

to lift and carry, he "would be guessing." (TR at 856.) Dr. Mahooti concluded the

questionnaire by recommending that Dr. Lee would be better suited to answer the

functional questionnaire. (TR at 859.) Such an obvious lack of interaction with

Robichau and limited knowledge of his medical history significantly discounts Dr.

Mahooti's standing a treating physician. As was the case with Dr. Yoon's opinion, the

ALJ gave less to weight to Dr. Mahooti's opinion to the extent that it was inconsistent

---

[12]

     The treating source rule provides

> that the ALJ should give 'more weight' to the opinions of treating
> physicians because 'these sources are likely to be the medical
> professionals most able to provide a detailed, longitudinal picture of
> [a claimant's] medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be obtained from the
> objective medical findings alone or from reports of individual
> examinations.' 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2).

*Bourinot v. Colvin*, – F. Supp.3d –, 2015 WL 1456183, at *11 (D. Mass. 2015) (alterations in
original).

with the diagnostic evidence of record.  As stated previously, the ALJ carefully examined and set forth Robichau's medical history, including diagnostic evidence, in his decision.

Based on the entirety of the medical records, treatment notes, and Plaintiff's description of his abilities, it was not unreasonable for the ALJ to conclude that the questionnaires submitted by Drs. Yoon and Mahooti exaggerated the extent of Robichau's physical limitations.  In support of his findings, the ALJ gave great weight to Dr. Astarjian's opinion. (TR at 37.)  Notably, the ALJ gave less weight to Dr. Matthews, also opining for the DDS, to the extent that she found Robichau to have greater standing and climbing ability and fewer environmental limitations than did Dr. Astarjian.  "The ALJ may rely on the opinions of non-examining sources to determine a claimant's RFC and need not to give greater weight to the opinions of treating physicians." *Crossley v. Colvin*, No. 13-cv-11427, 2015 WL 4512643, at *4 (D. Mass. July 24, 2015) (citing *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)).  The ALJ concluded that Robichau was capable of light work. (TR at 37.) "Where, as here, treating source opinions are inconsistent with other substantial evidence in the record, the SSA regulations do not require an ALJ to give the opinions controlling weight." *Bourinot,* – F. Supp.3d –, 2015 WL 1456183, at *12 (citing *Arruda v. Barnhart*, 314 F. Supp.2d 52, 72 (D. Mass. 2004); 20 C.F.R. §

404.1527(c)(3), (4); 416.927(c)(3), (4); SSR 96–2p, 1996 WL 374188, at *2); *see Rodriguez,* 647 F.2d at 222 ("[T]he resolution of conflicts in the evidence . . . is for [the ALJ], not for the doctors or for the courts."); *McNelley*, 2015 WL 3454721, at *5 ("Ultimately, the ALJ was within his discretion in giving small weight to [the treating physician's] opinion in light of other medical evidence in the record supporting a finding of lesser impairment.") (citing *Rodriguez,* 647 F.2d at 222). There is substantial evidence to support the ALJ's determination that the medical opinions of Drs. Yoon and Mahooti were not controlling.

## 2. Evaluation of Opinions

Plaintiff's alternative objection to the ALJ's evaluation of Drs. Yoon and Mahooti's opinions – that the ALJ failed to consider the factors listed in 20 C.F.R. §§ 404.1527 and 416.927 – is not persuasive. (#13 at 17.) The factors set forth in 20 C.F.R. §§ 404.1527 and 416.927 for evaluating a non-controlling treating source's opinion are as follows: 1) length of treatment; 2) nature and extent of relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors raised by the claimant. 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6). As described above, the ALJ's discussion of Robichau's treatment notes, imaging results, and other evidence in the record explicitly considers factors three and four: the degree to which the opinion is supported by relevant evidence and the consistency of the opinion with the

record as a whole. 20 C.F.R. §§ 404.1527(c)(3-4) and 416.927(c)(3-4). The decision also recounts Plaintiff's medical treatment history in detail, including individual appointments with Drs. Yoon and Mahooti.  Implicit in this review is the ALJ's consideration of the remaining factors: the treatment relationship between the claimant and physician, the practice specialty of the physician, and "other" relevant factors. Title 20 C.F.R. §§ 404.1527(c)(1-2), (5-6) and 416.927(c)(1-2), (5-6); *see Bourinot*, – F. Supp.3d – , 2015 WL 1456183, at *13.

Plaintiff's argument that "[t]he ALJ fail[ed] to weigh the doctors' opinions against the relevant factors" is unfounded. "The regulations do not require an ALJ to expressly state how each factor was considered, only that the decision provide 'good reasons' for the weight given to a treating source opinion." *Bourinot*, – F. Supp.3d –, 2015 WL 1456183, at *13 (citing 20 C.F.R. §§ 416.927(c)(2) and 404.1527(c)(2)). The ALJ's decision contains a thorough analysis and is supported by both medical opinion and diagnostic evidence. His reasons for discounting the opinions of Drs. Yoon and Mahooti are sufficient to apprise both Plaintiff and the Court of how each treating source opinion was evaluated. "Remand is not required where, as here, 'it can be ascertained from the entire record and the ALJ's opinion that the ALJ applied the substance of the treating physician rule.'"  *Bourinot*, – F. Supp.3d –, 2015 WL 1456183, at *13 (quoting *Botta v. Barnhart*, 475 F. Supp.2d  174, 188 (E.D. N.Y.

2007) (internal citation omitted)).

### 3. Non-treating Physicians

Despite the ALJ's in-depth explanation for finding the non-treating physicians' opinions more consistent with the record as a whole, Robichau argues that such a conclusion was reached in error.

### a. Completeness of the Record Upon Review

While Drs. Astarjian, Fierman, and Diaz did not personally evaluate Robichau, they reviewed the medical record before concluding that Plaintiff was not disabled. Plaintiff takes issue with the fact that Dr. Astarjian only reviewed Robichau's records through the date of his report, January 24, 2011.[13] (#13 at 16.)

> It is undisputed that the ALJ may rely on reports from non-treating physicians when they are more consistent with the record than reports provided by treating physicians. *See Berrios–Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir.1991); *DiVirgilio v. Apfel*, 21 F. Supp.2d 76, 80–81 (D. Mass.1998). Nevertheless, it is well established that medical evidence that is too far removed from the relevant time period cannot constitute substantial evidence if more recent records establish a significant worsening of the claimant's condition. *See Abubakar v. Astrue*, No. 11–cv–10456–DJC, 2012 WL 957623, at *12 (D. Mass. Mar.21, 2012), and cases cited. On the other hand, the ALJ may rely on the older evidence where it remains

---

[13]

Plaintiff asserts that Dr. Astarjian reviewed the medical record "through February 2011," which is a factual impossibility since Dr. Astarjian's report was completed on January 24, 2011. (*See* #13 at 16; TR at 124.)

> consistent with the current condition. *Id.*; *Ferland v. Astrue*,
> No. 11–cv–123–SM, 2011 WL 5199989, at *4 (D. N.H.
> Oct.31, 2011).

*Nelson v. Colvin*, No. 14-cv-10254, 2015 WL 1387864, at *12 (D. Mass. Mar. 25,

2015).  The record does not support, and Plaintiff has not argued, that Robichau's

condition significantly worsened  in the sixteen months between January 24, 2011, the

date Dr. Astarjian completed his assessment of Robichau, and the June 18, 2013, date

of hearing. (TR at 48, 124.) A January 26, 2012 electroencephalogram was within the

normal limits. (TR at 712.)  On June 11, 2013, a week prior to the hearing, Dr. Lee,

examining Robichau's April 10, 2013 MRI, concluded that there was no significant

central stenosis at any level in Plaintiff's spine and that the symptoms have been

chronic since 2006. (TR at  835.)

The assertion that Dr. Astarjian's opinion was based on "outdated records" falls

flat when the MIQ of Dr. Yoon is examined. (*See* #13 at 16.) Robichau noted Dr.

Yoon's reliance on MRI findings as a foundation for his opinion; the MRI in question

was administered in 2007.[14] (#13 at 15; TR at 741.) When the remainder of Dr. Yoon's

listed supporting clinical findings are examined, it is clear that they range from 2007-

2009. (*See* TR at 741.) Thus, it would be inapposite to find Dr. Yoon's reliance on

---

[14]

    Defendant notes that the "2007 MRI," referenced in Dr. Yoon's MIQ, is not contained in the
record. (#23 at 12 n. 9; *see* TR at 741.) It is Defendant's position that Dr. Yoon intended to reference
the 2008 MRI. *Id.*

"outdated" diagnostic imaging appropriate, yet discredit Dr. Astarjian's under the same theory.  Such an argument need not be decided, as Plaintiff has not demonstrated substantial change in his condition post January 2011, and the evidence contained within the record does not reflect such a deterioration. Dr. Astarjian's opinion was an appropriate source upon which the ALJ could rely in finding Robichau  not disabled.[15]

### 4. Treating Psychologist

Robichau argues that the ALJ "failed to give good reasons for rejecting the opinions [sic] from the treating psychologist." (#13 at 18.) While the ALJ gave less weight to Dr. Rudman, Plaintiff's treating psychologist, he did not reject her opinion as Robichau asserts.  Additionally, the ALJ provided sufficient reasoning for discounting the opinion: 1) the record does not contain any of Dr. Rudman's treatment notes; and 2) Dr. Rudman's disabling concentration limitations were inconsistent with Plaintiff's own statements.[16] (TR at 38.)

---

[15]

Robichau does not object to the opinions of Drs. Fierman and Diaz beyond their status as non-treating physicians, which will be addressed below.

[16]

The statements in question, appearing on page six of Robichau's Social Security Administration Function Report, are as follows:

> Q: For how long can you pay attention?
> A: Quite a long time.
>
> Q: Do you finish what you start? (For example, a conversation, chores, reading, watching a movie)
> A: Yes.

It is Plaintiff's position that the ALJ was required to obtain Dr. Rudman's records or express his concern for their absence. (#13 at 18.) Robichau cites *Bamford v. Astrue*, No. 12-10575, 2013 WL 870228, at *8 (D. Mass. Feb. 14, 2013) for the proposition that the ALJ "has a duty to develop the record independent of any duty on the claimant to present evidence . . . whenever the record 'does not contain all the necessary information . . .'." (*See* #13 at 18.) However, Robichau's reliance on *Bamford* is misplaced and the quoted portion of text is taken out of context. The *Bamford* court required such action

> only when the ALJ cannot determine the basis of a treating physician's opinion from the record. Accordingly, an ALJ must contact the medical source only when there is ambiguity in the opinion of the treating physician, not when evaluations are inconsistent with other information in the record or when the ALJ finds the treating physician's opinion unpersuasive.

*Bamford*, No. 12-10575, 2013 WL 870228, at *8 (quoting *Abubakar*, 2012 WL 957623, at *11) (internal quotation omitted) (emphasis added). The basis of Dr. Rudman's opinion is evidenced in her Psychological Impairment Questionnaire; she

---

Q: How well do you follow written instructions? (For example a recipe)
A: Very well.

Q: How well do you follow spoken instructions?
A: Pretty good.

(TR at 320.)

stated, under the laboratory and diagnostic support section, that her opinion is based on "self reports [] [and] some observation." The ALJ provided both a detailed description of Dr. Rudman's opinion and a thorough justification for his decision to discredit it. (*See* TR at 36, 38.) Nothing further is required.

Robichau also takes issue with the ALJ's second justification for discrediting Dr. Rudman's opinion: the inconsistencies between her opinion as to Plaintiff's ability to concentrate and Plaintiff's own statements on the subject. (#13 at 19.) Robichau contends that his own written statements were "incredibly vague" and "unclear," and therefore were insufficient support for the ALJ's conclusion. *Id.* The standard with respect to the evaluation of evidence as it relates to a treating physician's opinion bears repeating: "Decisions regarding inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ, and not the Court, to resolve." *Abubakar*, No. 11-cv-10456, 2012 WL 957623, at *8 (internal citations omitted).

In the alternative, Plaintiff takes the position that the factors enumerated in 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), as they relate to Dr. Rudman's opinion, suggest that deference should be afforded to her as a treating physician. (#13 at 19.) With respect to Dr. Rudman, Robichau does not suggest that the ALJ failed to consider the factors in his analysis, but rather came to the incorrect conclusion. *See id.* As he did regarding the opinions of Drs. Yoon, Mahooti, Astarjian, Fierman, and Diaz, the

ALJ provided sufficient explanation to apprise the Court and Plaintiff why he treated Dr. Rudman's findings as he did.  Remand is not warranted. *See Bourinot*, No. 14-cv-40016, 2015 WL 1456183, at *13.

## B. Plaintiff's Credibility

### 1. Limitations

Next, Robichau takes issue with the ALJ's evaluation of Plaintiff's credibility, arguing that the determination was not supported by substantial evidence. (#13 at 19-21.)  Plaintiff contends that the ALJ's conclusion – that Robichau's testimony with respect to his limitations exceeded what could reasonably be expected based on the entirety of the record – is contradicted by the opinions of two treating experts. (#13 at 21.)  Such an argument is nothing more than an attempt to reassert Plaintiff's objection to the ALJ's findings with respect to the weight given to the treating physicians' opinions, cloaked as an attack on the ALJ's determination of credibility.

The assertion that the ALJ's credibility determination was not supported by substantial evidence is unpersuasive. "[T]he ALJ was not required to credit [the claimant's] testimony."  *Del Rosario v. Colvin*, No. 13-30017, 2014 WL 1338153, at *7 (D. Mass. Mar. 31, 2014) (citing *Bianchi v. Sec'y of Health and Human Servs.*, 764 F.2d 44, 45 (1st Cir.1985) (recognizing the established principle that the ALJ "is not required to take the claimant's assertions of pain at face value.")); *Tozier v. Astrue*, No.

12-10359, 2013 WL 1282371, at *4 (D. Mass. Mar. 28, 2013); *Tetreault v. Astrue*, 865

F. Supp.2d 116, 126 (D. Mass. 2012) (An ALJ "is entitled to disbelieve subjective

complaints of disabling pain in the face of contrary medical evidence."). Such a

decision must be supported by evidence:

> The finding on the credibility of the individual's statements
> cannot be based on an intangible or intuitive notion about an
> individual's credibility. The reasons for the credibility
> finding must be grounded in the evidence and articulated in
> the determination or decision . . . .
>
> The determination or decision must contain specific reasons
> for the finding on credibility, supported by the evidence in
> the case record, and must be sufficiently specific to make
> clear to the individual and to any subsequent reviewers the
> weight the adjudicator gave to the individual's statements
> and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *4.  The ALJ must consider seven factors:

> If, after evaluating the objective findings, the ALJ
> determines that the claimant's reports of pain are
> significantly greater than what could be reasonably
> anticipated from the objective evidence, the ALJ must then
> consider other relevant information. *Avery v. Sec'y of Health
> & Human Servs.*, 797 F.2d 19, 23 (1st Cir. 1986).
> Considerations capable of substantiating subjective
> complaints of pain include evidence of: (1) the claimant's
> daily activities; (2) the location, duration, frequency, and
> intensity of the pain; (3) precipitating and aggravating
> factors; (4) the type, dosage, effectiveness and side effects
> of any medication taken to alleviate the pain or other
> symptoms; (5) treatment, other than medication, received for
> relief of pain; (6) any other measures used to relieve pain or
> other symptoms; and (7) any other factors relating to

> claimant's functional limitations and restrictions attributable
> to pain. *See id.* at 22; 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

*Cookson v. Colvin*, –F. Supp.3d–, 2015 WL 4006172, at *10 (D. R.I. July 1, 2015).

While the ALJ is required to consider all of the *Avery* factors, "an ALJ is not required to discuss every factor in its decision." *Silvia v. Colvin*, No. 13-11681, 2014 WL 4772210, at *6 (D. Mass. Sept. 22, 2014). The ALJ's consideration of the *Avery* factors can be seen throughout his decision, specifically in his analysis of Robichau's RFC. (*See* TR at 32-39.)

> The Court may overturn an ALJ's credibility determinations <u>only</u> when it concludes that the ALJ has ignored evidence, misapplied the law or judged medical matters that should be left to experts. The Court may also remand cases when the ALJ has provided insufficient explanations for findings or has failed to consider relevant evidence.

*Silvia*, 2014 WL 4772210, at *7 (emphasis added). The ALJ's decision partially to discredit Robichau's testimony was supported by substantial evidence.

## 2. Evaluation of Treatment and Medications

Robichau's contention that the ALJ "erred by criticizing [] Robichau's treatment with medications and lack of prescription medications while he was in jail for four months" is a mischaracterization of the ALJ's factual analysis. The argument ignores the deference afforded the ALJ's findings of fact. Plaintiff's support for his position is limited to his own reports of pain. (*See* #13 at 21) ("after he was released, Mr.

Robichau reported constant pain . . .").  As explained in the preceding section, the ALJ was well within his province to find Robichau not entirely credible with respect to the intensity, persistence, and limiting effects of his symptoms.

The assertion that the ALJ "offered his own lay judgment of the severity of [Plaintiff's] symptoms" is flatly contradicted by the record of Plaintiff's treatment.  At Robichau's September 17, 2012 visit with Ms. Carney, Ms. Carney reported that she "called the Middlesex County Correction Facility and spoke to the infirmary who reports they weaned [Robichau] off all narcotics while in prison and he did well taking Motrin [] and did not exhibit signs of uncontrolled pain." (TR at 780.) The record from the September 17th visit reflects that Ms. Carney concurred with the Jail's treatment of Robichau without the use of narcotics. *See id.* ("[b]ased on this [finding] we will continue ot [sic] prescribe only Motrin[,] but will give him the option of following up with a pain clinic.") The ALJ cited to this report in his decision.[17] (*See* TR at 38.)

The ALJ's findings with respect to Robichau's level of pain without the use of narcotics are supported by substantial evidence. (*See* TR at 38-39.) Further, the finding was but a single piece of the ALJ's comprehensive analysis of the credibility of Robichau's testimony. In reaching his ultimate conclusion that Plaintiff was not

---

[17]

It should be noted that the ALJ refers to this report as an appointment with Dr. Yoon. (*See* TR at 38.) As noted previously, Ms. Carney is listed as the provider on the report, while Dr. Yoon is listed as the supervisor and co-signed the report. (*See* TR at 779-781.)

credible to the extent that his testimony exceeded the ALJ's findings, the ALJ sufficiently analyzed the entirety of the record and provided justification for his findings. There is no error.

## V. <u>CONCLUSION AND ORDER</u>

For all the reasons stated, it is ORDERED that Plaintiff's Motion For Judgment On The Pleadings (#12) be, and the same hereby is, DENIED.  It is FURTHER ORDERED that Defendant's Motion For An Order Affirming The Decision Of The Commissioner (#22) be, and the same hereby is, ALLOWED.  Judgment shall enter for Defendant.

<u>/s/ M. Page Kelley</u>
M. Page Kelley
United States Magistrate Judge

September 2, 2015.